JANE COLSON, Respondent, *v.* MATTHIAS H. ARNOT, Appellant.

Where a thief or finder of negotiable paper, payable to order, which has been indorsed and put into circulation by the payee, erases the indorsement, and, subsequently, personating the payee, forges his signature and transfers the paper to a *bona fide* purchaser for value, no title passes as against the true owner. (DWIGHT, C., dissenting.)

In such case the purchaser does not take from an apparent owner, nor does he rely upon what appears upon the paper, but he relies upon, and is deceived by the representations of the wrong-doer; against such deception the rules applicable to negotiable paper are not intended to protect. (DWIGHT, C., dissenting.)

The indorsement by the payee does not unalterably fix the character of the paper so as to make it negotiable by delivery. The indorsement may be erased by the owner, and then it is only negotiable after the signature of the payee is again procured; and while the finder or thief is as to the true owner a stranger, and so cannot affect the latter's rights by such erasure, the purchaser deals with him upon the assumption that he is the owner, and, while claiming him competent to give title, cannot deny his power to thus destroy the negotiability of the paper. (DWIGHT, C., dissenting.)

The authorities as to alteration and spoliation of instruments collated by DWIGHT, C.

(Argued January 9, 1874; decided May term, 1874.)

APPEAL from order of the General Term of the Supreme Court in the third judicial department, setting aside a verdict for the defendant at the circuit, and granting a new trial.

This action was brought by the plaintiff, after demand and refusal, to recover the possession of two county bonds of $300 each.

The bonds were issued September 1st, 1864, and due March

1st, 1866, payable to the order of one Jonathan S. Roll, a volunteer in the military service of the United States. Roll transferred them before maturity by an indorsement in blank and for a valuable consideration, to the plaintiff. The following is a copy of one of the bonds which were alike, except as to numbers:

"STATE OF NEW YORK.

"$300.                                        No. 305.

"On the 1st day of March, 1866, the county of Seneca promises to pay to the order of Jonathan S. Roll, three hundred dollars, with annual interest, at the office of the Treasurer of said county. Dated Sept. 1st, 1864.

"JOSIAH ROGERS, *Chairman.*

"SILAS KINNE, *Clerk.*"

*(left margin, vertically:)* "Seneca county bond, issued, in pursuance of resolutions passed at a special meeting of the board of supervisors of said county, held at Waterloo, Aug. 5, 1864."

*(right margin, vertically:)* "Interest payable on the 1st of March, 1865. Last installment payable with bond."

There was an indorsement on the bond that interest had been paid to March 1st, 1865.

The bonds were lost or stolen from the plaintiff's pocket on the 13th day of May, 1865. On the 25th day of October, 1865, and before the maturity of the bonds, they were offered for sale to the defendant at the Chemung Canal Bank, in Elmira, of which institution he was an officer. They were purchased by him in the course of trade, though he did not follow the specific business of buying and selling county bonds. When the bonds were purchased, the indorsement of the payee's name had been erased, though it was there at the time of the loss or theft. There was no evidence that the defendant had any knowledge of the erasure. The defendant having no acquaintance with the person professing to be the payee, who offered them to him for sale, declined to purchase without identification. This was supplied by a person named Churchill, known to the defendant, who was a person also known not to be of the highest character, but not known to be of positively bad character. The personator of the payee, on writing the first name of the payee on the bonds, spelled it in one case "Johonithan," and in the other, "Johenithan."

There was evidence at the trial that the plaintiff, on the seventeenth day of May (the next business day after the theft), caused her loss to be advertised in one of the Elmira newspapers. It, however, appeared that the defendant did not take the paper, and he did not see the advertisement. There was some slight evidence that the plaintiff, through her husband's agency, gave oral notice of the loss at the Chemung Canal Bank. The weight of testimony was against this view. At all events, it did not appear that the defendant was not cognizant of the notice, even if it were given.

The bonds were purchased for $580. The evidence showed that the amount paid was equal to their market value in Elmira at the time of the sale.

The counsel for the plaintiff, at the close of the trial, asked the judge to direct the jury to find a verdict for the plaintiff on the following grounds, among others: That these bonds having no genuine indorsement at the time of the transfer to the defendant, he did not get title as against the plaintiff; the appearance of the bonds was such that he got no title; he did not get the bonds in the usual course of business; defendant has not shown that he purchased the bonds under circumstances which gave him a valid title as against the plaintiff. The request made on these grounds was refused by the court, and the plaintiff duly excepted.

The plaintiff's counsel further asked the court to submit to the jury the following propositions:

1. Did the defendant pay for the bonds a full and fair consideration?

2. Was the act of buying the bonds, without examining to see whether they were indorsed by the payee, an act showing willful ignorance?

3. Was the fact that he did not inquire of the personator of the payee as to points suggested by the appearance of the bonds, an act showing willful ignorance, or that the purchase was not made in the usual course of business?

4. Was the fact that the defendant purchased without examining the mode in which the name of the payee was

spelled, a fact showing that he purchased in willful ignorance, or not in the usual course of business?

5. Was his act of buying, without examining the indorsement, in accordance with the usual course of trade?

6. Was the act of buying, without questions, in the usual course of trade?

7. Was it in the usual course of trade to buy such bonds of strangers only identified by men of bad character?

These requests having been separately made and refused, the plaintiff duly excepted.

The court directed the jury to find a verdict for the defendant, and to assess the damages for the detention of the bonds at a nominal amount, and their value at $600, to which direction the plaintiff excepted. The exceptions in the cause were ordered to be heard in the first instance at the General Term.

*John Murdock* for the appellant. The bonds in question, when indorsed by the payee, became negotiable paper; and when transferred to a *bona fide* holder his title became absolute, although the transfer was by a thief. (25 N. Y., 496; 29 id., 220; 19 id., 20; 10 Bosw., 332; 26 How., 225.) These bonds having become commercial paper by the indorsement of the payee, their character became thereby fixed, and no act of a thief or trespasser could change them in this respect. (25 N. Y., 496; 10 Bosw., 332; 1 Pars. N. and B., 33; 2 id., 260, 574; Chitty on Bills, 140, 156; 14 Abb. Pr., 278; 8 Mason, 478; 8 Cow., 71; 45 How. Pr., 492; 45 Barb., 236; *Miller* v. *Race*, Smith's L. Cas., 597.) There was nothing in the circumstances attending the purchase of the bonds tending to invalidate defendant's title to them. (44 Barb., 87; 63 id., 237; 19 Abb., 47; 7 id., 96; 29 How., 409; 1 Pars. N. and B., 254, note; 5 Duer, 269; 2 Dailey, 383; *Belmont* v. *Hoge*, 35 N. Y., 68; *Magee* v. *Badger*, 34 id., 249; *Birdsall* v. *Russell*, 29 id., 220; 47 id, 143; 30 Barb., 224; 34 id., 443; 2 Pars. N. and B., 274–279, 284.) Plaintiff having by her neglect lost the bonds and enabled the finder of them to commit the fraud, is charged with the

loss. (47 N. Y., 147 ; 97 Eng. C. L., 87 ; 13 id., 420 ; 4 Mass., 45 ; *Miller* v. *Race*, Smith's L. Cas., 597 ; 22 Wend., 348.)

*J. E. Dewey* for the respondent. A fraudulent alteration of commercial paper renders it void in the hands of the party making the alteration, or in the hands of *bona fide* purchasers. (2 Pars. N. and B., 30, 557–559, 564, 571, 574, 582, 584.) The indorsee of paper is presumed to know the handwriting of the indorser, and he is not at liberty to controvert this presumption. (Edws. on Bills, 290, marg. page ; 2 Smith's L. Cas. [ed. 1855], 619, marg. page, 459.) If any defect appear on the face of a paper, it is matter of legal construction whether it conveyed notice. (7 Bos., 564 ; 1 Pars. N. and B., 259, note ; 15 Wend., 362 ; 12 J. R., 305 ; 4 Mass., 370 ; 29 N. Y., 220, 250, 251 ; 15 id., 354.) The facts here show *mala fides* or willful ignorance on the part of the defendant. (Edws. on Bills, 291 ; 7 Bos., 465 ; 29 N. Y., 244 ; 1 Pars. on N. and B., 259, 260 ; 1 Rob., 546, and authorities cited ; 15 N. Y., 354 ; 20 How. [U. S.], 348, 353, 367, 370 ; 4 Ad. & El., 870 ; 2 Pars., 270 ; 1 id., 276 ; 5 Sand., 167.) The judge erred in refusing to submit to the jury the question whether Arnot paid a full and fair consideration for the bonds. (16 Barb., 551 ; 34 N. Y., 247 ; 35 id. ; 2 Pars., 275.) Defendant was not a *bona fide* holder. (1 Robt., 538 ; 5 Sand., 165–170, 172 ; 5 Wend., 566 ; 12 J. R., 306 ; 1 Den., 583.) There was sufficient constructive notice to defeat the purchaser's title. (29 N. Y., 220, 673 ; 31 id., 33, 43, 49 ; 17 id., 233 ; 19 id., 312.) It was not necessary to show *mala fides* between these parties. (29 N. Y., 554, 568 ; 26 How., 270.)

EARL, C. It is undisputed that these bonds, with the indorsement thereon of the name of the payee, were negotiable by delivery, like promissory notes and bills of exchange. A thief or a finder could give title to them to a *bona fide* purchaser for value ; and the same rules are applicable to

them which apply to other negotiable paper. (*Bank of Rome* v. *Village of Rome*, 19 N. Y., 20 ; *Birdsall* v. *Russell*, 29 N. Y., 220 ; *Brainerd* v. *New York and Harlem Railroad Company*, 25 id., 496.)

The indorsement of these bonds by the payee did not unalterably fix their character, so as to make them negotiable by mere delivery. Any lawful holder could fill up the blank indorsements by making them payable to his own order or the order of another person, and then they could not pass by mere delivery. And any person owning them could have erased the indorsement of Roll. This would not have destroyed the bonds but would have destroyed the indorsements, and then they could have been negotiated again only after the genuine indorsement of Roll was again procured. Any lawful owner of such paper can, without avoiding the paper itself, erase and thus cancel, any or all the indorsements thereon, without affecting his title to the paper or his right to resort to any of the names thereon prior to those erased. (*Dollfus* v. *Frosch*, 1 Denio, 367 ; Chitty on Bills, 230 ; Story on Promissory Notes, § 142 ; 2 Parsons on Notes and Bills, 29.) Any intentional, material alteration of such paper, by the owner thereof, will destroy it, so that he cannot maintain an action thereon against any of the parties thereto. But an accidental destruction or mutilation thereof, or an unintentional alteration therof, by the owner, will not have such effect; and neither will the destruction, mutilation or alteration thereof by a stranger have such effect. In such cases secondary evidence can be resorted to, to establish the paper, and a recovery had upon it as it was originally made. (1 Greenleaf's Evidence, 566 ; 2 Parsons on Notes and Bills, 574.)

The general rule applicable to personal property is, that the seller, although in possession of the property, can give no better title than he has. From the operation of this rule negotiable paper is excepted. The exigencies of business and commerce are such as to require the free circulation of such paper. It takes the place and performs, to a large

extent, the office of money. It is used for the transaction of much the largest part of the business of mankind. It would be most embarrassing, therefore, if every taker of such paper was bound, at his peril, to inquire into the title of the holder, and if he was obliged to take it with all the imperfections and subject to all the defences which attach to it in the hands of the holder. It has, therefore, for more than 200 years, been the settled law of England and this country, that a thief, or any other person having possession of such paper, fair upon its face, can give, a *bona fide* purchaser for value, a good title to it, against all the parties thereto, as well as the true owner. To have this quality it must be fair and regular upon its face; it must be payable to bearer, or to order and indorsed by the payee. A forged indorsement, no matter how cautious the purchaser may be, will give no title. (*Graves* v. *American Exchange Bank*, 17 N. Y., 205.)

Upon what theory is it that a holder, without title, can transfer title to such paper? It is said it is because the law arbitrarily gives him the capacity to transfer title to such paper to a *bona fide* holder for value. I apprehend that a better statement of the theory is, that he has capacity to give the title, because he is the apparent owner of the paper. Every holder of such paper is presumed to be the owner. Unless he be the apparent owner, he cannot give title even to a *bona fide* purchaser for value, and unless the purchaser relies upon the apparent ownership, he cannot be a *bona fide* purchaser. Mr. Justice CLIFFORD, in *Goodman* v. *Simonds* (20 How. [U. S.], 365), speaking of such paper, says: " The title and possession are considered as one and inseparable, and, in the absence of any explanation, the law presumes that a party in possession holds the instrument for value until the contrary is made to appear." In *Central Bank of Brooklyn* v. *Hammett* (50 N. Y., 158), it is said, by the court, that " one who obtains the transfer of negotiable paper before maturity, and for full value, without notice of any defect in the title of the apparent owner, acquires all the rights of a *bona fide* holder by title derived

from the actual owner. The possession of a bill or note, payable to bearer or indorsed in blank, by one not a party to the instrument, is presumptive evidence of ownership." In *Belmont Branch Bank* v. *Hoge* (35 N. Y., 65), Judge PORTER says: "One who, for value, obtains from the apparent owner a transfer of negotiable paper before it matures, and who has no notice of any equities between the original parties, or of any defect in the title of the presumptive owner, is to be deemed a *bona fide* holder."

The thief, in this case, was not the apparent owner of the bonds. He came to the defendant with two bonds, payable to the order of Roll, without his indorsement upon them. It matters not that he personated Roll, and the defendant believed him to be Roll. The defendant is in no better position as to title than he would have been if he had known who the thief was. He did not take paper, fair and regular upon its face, from a person having possession of such paper, and apparently the owner thereof. The false personation and forgery give him no title He did not rely upon anything that appeared upon the bonds, and was not deceived or misled by them. But, he relied upon the representations of the thief, and was deceived by them. Against such deception the laws, applicable to negotiable paper, were not intended to guard. It is their purpose to facilitate the circulation of paper, fair and regular upon its face, and to protect the *bona fide* purchasers of such paper. The exigencies of business and commerce do not require that paper, payable to order, should circulate freely without indorsement. The reason which lies at the foundation of the laws, in reference to the transfer of negotiable paper, does not apply to such a case, and the maxim, *cessante ratione legis cessat ipsa lex*, should be applied.

In further illustration, suppose the thief of negotiable paper entirely destroys it, can he make a *fac simile* and give any one a cause of action upon the original instrument? This will not be claimed, and yet the owner has lost none of his rights. He must treat the paper as if it had not been

destroyed. He must make demand and protest for non-payment, and bring suit upon the original instrument, and give secondary evidence of its contents. The thief cannot, by false personation or forgery, give title to the cause of action upon the original instrument, because he is not the possessor or apparent owner thereof. Suppose a thief should erase the name of the maker or drawer of a note or bill of exchange, and then forge the same signature, could he give a *bona fide* purchaser for value, title to the paper? I am clearly of opinion that he could not. The paper is not fair upon its face. There is a forgery, and although the purchaser may be ignorant of it, the law-merchant does not protect him against such ignorance. He must know at his peril that the signatures are genuine. We are asked, suppose the name of the payee, indorsed upon mercantile paper, fades out so as to be invisible, does it affect the negotiable character of the paper? Most certainly it does. The title and rights of the owner remain the same as before; but a thief could give no title to such a paper to any one, because he cannot be the apparent owner thereof, and there is nothing on the face of the paper to induce belief that he is the owner.

But there is another course of reasoning, equally conclusive, it seems to me, which defeats the defendant's claim. The thief was not in every sense a stranger to the bonds; he was such as to the plaintiff, and whenever she has reclaimed them, she will hold them unaffected by anything which the thief has done to them. But was he a stranger as to the defendant? Assuming that he may be treated as a *bona fide* purchaser, all the title he claims he got from the thief. As to him, the law treats the thief as the owner; he dealt with him upon the assumption and presumption of his ownership. It is not for him to say that the thief was not the owner, and while he claims that he was competent to give him title, he cannot deny that he was competent to destroy the paper by its mutilation or alteration. As to him, the thief had the same power, while he held the paper, to erase the indorsement and thus make it non-negotiable by mere delivery, as the true owner would

have had.   One who buys such paper from a thief must take it in the condition it is when it leaves the hands of the thief, and he can take it in no other way.  I can perceive no reason for awarding a purchaser from a thief, a better position than he would occupy if he had purchased from the same person being the true owner.   Suppose the thief had altered these bonds by raising them to $3,000, and had not erased the indorsement, how would that have affected the bonds?   As to the plaintiff, it would have been a mere act of spoliation and would have had no effect.   But as to a purchaser from the thief, it would have destroyed them.   He could neither enforce them for $3,000 nor $300.   It cannot be the policy of the law to facilitate the free circulation of forged, altered or mutilated paper.   The purchaser of such paper must take the risk of its genuineness.   The law protects him only in the purchase of genuine commercial paper, in good faith.

It follows, that the order of the General Term must be affirmed, and judgment absolute ordered against the defendant, with costs.

DWIGHT, C. (dissenting).   The real questions in this case are two in number.   I. Can the defendant, assuming that he acted in good faith and paid value, make title to the bonds in controversy from a finder or a thief, as the case may be, though the name of the payee, indorsed by himself, has been erased from the bonds by such finder or thief, after the paper has gone into circulation and before it was acquired by the defendant?   II. If this question be answered in the affirmative, is there any such evidence of want of good faith, on the defendant's part, as required a finding upon it by the jury?

I. The first of these questions leads to a consideration of some extraordinary circumstances to which the researches of counsel have found no parallel in any reported case.   A thief or finder erases the genuine blank indorsement of a payee of a negotiable county bond after the paper has passed into circulation.   The erasure is made carefully, so as not to attract attention, at least that of a casual observer.   In its mutilated

condition the paper is offered for sale to the defendant, an officer of a bank, who has made other purchases of county bonds. The offerer personates the payee and is so identified by a person known to the defendant. The paper is indorsed by him and the purchase is made, as will be assumed, at the present stage of the inquiry, in entire good faith, and the market value paid. The question is, is the payee's indorsement, though actually erased, still in point of law a part of the bond, so that a holder can establish its existence by secondary evidence and trace his title through it? It will not be denied that, if the indorsement had remained on the bonds in controversy, as it was when they were stolen, the thief or finder could have conferred a complete title upon the defendant, purchasing in good faith and for value, thus defeating the title of the plaintiff. (*Miller* v. *Race*, 1 Burrow, 452; 1 Smith's Leading Cases, 250, and cases there cited.) The rule there established as to promissory bank notes is applicable to such securities as were transferred in the case at bar. (*Bank of Rome* v. *Village of Rome*, 19 N. Y., 20; *Birdsall* v. *Russell*, 29 N. Y., 220 ; *Brainerd* v. *N. Y. and Harlem R. R.*, 25 N. Y. 496.)

The grounds of this rule must be briefly considered. It excepts negotiable paper from a principle applicable to all other personal property. In general, it is familiar law that a thief, finder or bailee, can transfer to another no greater title than he himself possesses. The reason of the exception in the case of negotiable paper was first fully disclosed in *Miller* v. *Race* (*supra*). It is rested by Lord MANSFIELD on grounds of public policy and the interests of trade. He said "trade and commerce would be much inconvenienced by a contrary determination." In another part of his opinion he presents the same view in another form. "It is necessary, for the purposes of commerce, that the currency of bank notes (the transfer of which he was specially considering) should be established and secured."

As preliminary to a consideration of the defendant's rights in the present case, it is important to examine the nature of

the act done by the thief when he erased the indorsement.
It was not in the legal sense of the word, an *alteration*. It
was a *spoliation*. The counsel for the plaintiff has been mis-
led by confounding these different acts. Had Roll himself
(the payee), before issuing these bonds to the plaintiff, written
his name on the back of them and then erased it, and they
had been lost, no title would have passed from a finder to the
defendant, as there would have been no true "indorsement,"
which *ex vi termini* imports a delivery. If the plaintiff,
while owner, had canceled the indorsement through which it
was necessary for her to claim title, it might have been claimed
that her act had rendered the contract implied from the
indorsement void. (1 Greenleaf on Evidence, § 565 ; *Grimes*
v. *Piersol*, 25 Ind., 246.) But in the present case, the act
was done by a person who had no title at all. It was a pure
wrongful act, adverse to the interests of the owner, and
impairing the *evidence* of ownership, but having no effect
upon the owner's right. (1 Greenleaf on Evidence, § 566 ; 2
Parsons on Notes and Bills, 574.) Says Greenleaf : " A
distinction is to be observed between the alteration and the
spoliation of an instrument, as to the legal consequences.   *   *
Alteration is, at this day, usually applied to the act of the
party entitled under the deed or instrument, and imports
some fraud or improper design to change its effect. But the
act of a stranger, without the participation of the party inter-
ested, is a mere spoliation or mutilation of the instrument, not
changing its legal operation so long as the original writing
remains legible, and if it be a deed, any trace remains of the seal.
If the instrument in this way is mutilated or defaced, so that its
identity is gone, the law regards the act, so far as the rights
of the parties to the instrument are concerned, merely as an
accidental destruction of primary evidence, compelling a resort
to that which is secondary, and, in such case, the mutilated
portion may be admitted as secondary evidence of so much of
the original instrument." Mr. Parsons states the rule in the
following language : " A broad distinction is made between
alterations by parties and by strangers, which latter have been

styled spoliations. In this country, any alteration, however material, does not avoid an instrument if made by a stranger to it, unless it be such as to render the original words illegible or uncertain, in which case it operates like the destruction of the paper, and then we think it would open the case for the proof of its contents by secondary evidence." Another view of the case is, that an erasure by a stranger is a mere accident, like a destruction by the elements. (*Lee* v. *Alexander*, 9 B. Mon., 25; *Harrison* v. *Tuberville*, 2 Humph., 242; *Bigelow* v. *Stelphen*, 35 Vt., 521.) In *Justus* v. *Cooper* (7 Blackf., 7) the payee's name was erased so as to be illegible. The court held he could recover by proper parol evidence. This course of reasoning shows that spoliation has no effect upon the *rights* under a contract; it only modifies the remedy, or calls into operation a subordinate rule of evidence. It is well settled, that every indorsement of negotiable paper imports a contract. Notwithstanding the erasure, Roll still remained liable on that contract to the plaintiff, until a valid transfer to another was made. Had the plaintiff received back the bonds from the thief and then indorsed the name of Roll in the same manner as the thief did, she would have undoubtedly passed to the defendant, not only the bonds themselves, but the right to claim under Roll's indorsement and to sue him upon it, though it were invisible and its existence unknown to the defendant. The whole matter thus becomes narrowed down to this single point, could the thief, on the day of the sale, make as complete a transfer of the bonds, and the valid subsisting indorsement of Roll as the plaintiff could have done, had she been present through an agent and performed the same acts?

The true principle governing the case is, that the finder, for the purpose of protecting a purchaser in good faith, is placed in such a position that, while he is not owner in any sense, he has by a rule of public policy, a *capacity* to transfer the paper to such a purchaser. So, in England, a thief may give a good title to ordinary chattels, by a sale in open market to a purchaser in good faith. It cannot be pretended, in

such a case, that a thief is an owner, or has any title beyond a mere naked and wrongful possession. The law, from reasons of public policy, gives him a capacity to sell, not derived from ownership but from a positive and arbitrary legal rule. A sale in market overt, is governed by the same general rule as that of.negotiable paper, and is upheld in like manner only in the case of purchasers for value and in good faith. (Benjamin on Sales, 6–10.)

The result is that the defendant, acting in good faith, may rest his case on the proposition that the thief, holder of the bonds and personator of Roll, conferred upon him all existing rights derived from the bonds themselves and their indorsement. He fulfills the accepted definition of a *bona fide* holder — "one who acquires the paper in good faith and for a valuable consideration from one capable of transferring it." (1 Parsons on Notes and Bills, 254.)

The plaintiff, however, claims that the defendant's protection, as a purchaser, depends upon the fact that the *evidence* of the payee's indorsement is presented to him and that, upon the faith of that evidence, he parts with value. The indorsement must be visibly written, and not merely potentially present. The doctrine requires that if there were any number of special indorsements, they must all be visible and also legible. It casts upon the holder, in the rapidity of commercial business, the duty of recognizing at his peril, the actual existence of a series of special indorsements, and shuts him out in the case that the indorsement is potentially but not visibly present, from any proof of its presence by secondary evidence. Had the indorsement been made in ink which had faded so as to be invisible, would negotiability have been lost? If Roll's personator had in that case forged his name, could not a purchaser in good faith, on discovering the facts, have traced his title, through the original indorsement, by parol evidence? It will scarcely be contended that if the ink had faded *after* the purchase, the buyee could not show the indorsement by parol. If the plaintiff's theory is sound, the defendant's title is made to turn upon the point whether invisi-

bility creeps over the indorsement before or after the transfer.

This proposition, so inconvenient to the commercial class, cannot be maintained either upon principle or authority. It is the *fact* that paper has become negotiable and partakes of the nature of currency, that protects the defendant, on broad grounds of public policy, and not the evidence of the fact. The plaintiff's doctrine would even extend to bank notes; which could no longer be circulated with safety and taken from a thief, by one receiving them in good faith, unless the holder were able to show, affirmatively, that when he took the paper the signatures of the bank officers were visible.

It will be admitted that the plaintiff lost no rights by the erasure of the indorsement. What if she, herself, had put them in circulation in exactly the form adopted by the thief? It may be supposed that he returned them to her with the forged indorsement, and that she, thereupon, issued them. Would not the purchaser, then, have been entitled to the invisible indorsement, so as to have charged Roll, in case the county did not pay, at maturity? If so, then the thief does not, under the plaintiff's theory, have *the same* power of transfer, to a holder in good faith, as the owner possesses. Commercial men must, then, recognize two rules of transfer — one for owners, another for thieves — while they have no means of distinguishing whether the person with whom they are dealing is an owner or not. Such a principle would subvert the great rule of public policy enunciated in *Miller* v. *Race* (*supra*), and which has become so firmly imbedded in our commercial law. How is this rule, requiring that a purchaser should have ocular evidence, to be applied? Supposing that the erasure, by a powerful microscope, can be made visible, or, that the color of the ink can be restored by some chemical process; shall the title of the purchaser in that case fail? Or, must the purchaser actually *see* the indorsement before he purchases? In that case, must the blind, or those of imperfect vision, cease to deal in commercial paper? How much more satisfactory is Lord ELLENBOROUGH's theory (in 6

East, 309), where, an award having been altered by a stranger, he said he would read the case with the eyes of the law, and so read the award as it originally was. The sound view is, that the only way in which a failure of the evidence can be made available is, to show that the holder did not take title in good faith. That point is not now under consideration.

It is further claimed, on the plaintiff's behalf, that the thief, as far as the defendant is concerned, must be regarded as owner; that the defendant traces his title through him, and, therefore, that the erasure was not an act of spoliation by a stranger, but of alteration by an owner, thus destroying the title to the instrument, in reference to the defendant. This is a misconception of the rule governing the subject. A thief or a finder is in no sense an owner. Before the transfer of the paper, he has no greater rights than a casual bailee of merchandise. His capacity begins at the moment of transfer, and applies only to one form of dealing, a sale to one buying in good faith. Says Parsons: "The thief of a stolen note has obviously no title or property in it himself, although one ignorant of the theft may derive title from him." (2 Bills and Notes, 265; *Martin* v. *Bank of U. S.*, 4 Wash. C. C., 253; Chitty on Bills, 257.) His power to sell the stolen paper is derived from a rule of public policy, and his capacity to do any act respecting it, must be affected and, in fact, measured by that rule. This is established solely for the protection of purchasers, and cannot be so strained or perverted as to work them an injury. For the purpose of protecting a purchaser, a finder or depositary has the power of disposition. When he does an act despoiling the purchaser of his rights, his act is that of a pure wrong-doer, no more affecting the purchaser than the owner himself. There can be no element of public policy in the view that a spoliator, because he happens to hold the place of a mere depositary, can overthrow the interests of a purchaser, by secretly and cunningly altering the instruments on which such purchaser has an apparent right to repose.

These views are sustained by the case of *Commonwealth*

v. *Emigrant Industrial Savings Bank* (98 Mass., 12, 18).
The controversy there was, whether an immaterial alteration
of the numbers of certain negotiable bonds destroyed them in
the hands of an innocent holder? It was conceded, that if
the alteration had been made by an owner with fraudulent
intent, the instrument would have been avoided in his hands.
(2 Parsons on Bills and Notes, 572, and cases.) It was uncer-
tain whether the alteration was made by a holder for value,
or a thief. The court discussed the question in both aspects,
and held that the doctrine of invalidity in such a case could
not be extended to a holder in good faith. It said : " Should
it be held that one who claims title under the fraudulent per-
son shall only succeed to his rights, it is difficult to see the
just application of the principle to the case at bar. The
innocent holder of a negotiable security, payable to bearer,
does not take his title from that of any previous holder, but
*under the original contract of the promisor*, as construed by
the law. The thief who stole these bonds had no title to them
whatever. The innocent holder does not claim under him in
form or substance." (Page 18.) The true view is, that an
owner having paper which can enter into circulation, is
estopped from saying that the thief has not the power to
make the transfer. It is but the application of the salutary
rule, that, when one of two innocent persons must suffer, he
who has enabled the third person to occasion the loss must
sustain it. This is the principle, as stated in Chitty on Bills,
256. When one promises, in a negotiable instrument, to pay
A. or his order, and A. indorses it in blank, any holder, for
value, may write his name over the blank indorsement, and
claim that the *original promise* was made to him. In such
a case, if he took the paper from a thief, he would not trace
his title through him, but through the transfers made by
indorsement. The thief has been merely an instrument, by
which he has been put in a position to have the promises
contained in the bill or note made to himself.

It is scarcely necessary to add that the forged indorsement
of Roll's name by the personator had no legal effect either in

giving a right to the defendant or in destroying one otherwise vesting in him.

If the defendant took the bonds in good faith they belong to him.

II. The next inquiry is, whether there is any evidence to go to the jury as to the good or bad faith of the defendant. I think not. After the plaintiff had proved the loss of the bonds it was incumbent on the defendant to show that he paid value for them. The evidence on this point is satisfactory. The burden of proof was then shifted to the plaintiff to establish the bad faith of the defendant. Some cases have held that the holder's title is defective, unless he exercises due caution. He must not have acquired the paper under circumstances which ought to have excited the suspicion of an ordinarily prudent and careful man. (*Gill* v. *Cubitt*, 3 B. & C., 466.) This doctrine is now wholly exploded in England. Negligence or even gross negligence is not sufficient to impeach the holder's title. It has been well remarked that "reasonable caution" is difficult to define, and presents a dangerous question to leave to a jury. The present English view that the holder's title can only be impeached by evidence of bad faith is maintained in this country by *Goodman* v. *Simonds* (20 How. [U. S.], 343); *Murray* v. *Lardner* (2 Wall. [U. S.], 110); *Belmont Branch Bank* v. *Hoge* (35 N. Y., 65, 68); *Welch* v. *Sage* (47 id., 143); *Spooner* v. *Holmes* (102 Mass., 503); *Phelan* v. *Moss* (67 Penn. St., 59); *Seybel* v. *National Currency Bk.* (54 N. Y., 288). The rule is well stated in *Magee* v. *Badger* (34 N. Y., 249) by Porter, J. "A holder of commercial paper is not bound, at his peril, to be on the alert for circumstances which might possibly excite the suspicions of wary vigilance. He does not owe to the party who puts negotiable paper afloat the duty of active inquiry to avert the imputation of bad faith. The rights of the holder are to be determined by the simple tests of honesty and good faith, and not by a speculative issue as to his diligence or negligence." These propositions are reaffirmed in *Belmont Bank* v. *Hoge* (*supra*). They are applied specific-

ally to the case of stolen bonds in *Welch* v. *Sage* (47 N. Y., 143). It is there said " the law may be regarded as settled that a purchaser for value of negotiable paper, including bonds, is not bound to exercise such care and caution as wary, prudent men would exercise. Negligence will not impair his title. It is a question simply of good faith in the purchaser. Unless the evidence makes out a case upon which a jury would be authorized to find fraud or bad faith in the purchaser, it is the duty of the court to direct a verdict." (Pp. 146, 147.)

There is no evidence in the present case to impeach the defendant's title, such as this rule requires. The defendant paid the market value for the bonds. He took them in the course of business or of trade. It is not necessary, for his protection, that a purchaser should follow the specific business of buying or selling bonds. It is enough if he takes them " in the course of trade." (3 Kent's Com., 81 ; Byles on Bills, 125 ; *Peacock* v. *Rhodes*, 2 Douglas, 633 ; *Goodman* v. *Simonds*, 20 How. [U. S.], 343.) There may have been some want of the most active diligence in the failure to observe the misspelling of the payee's name. The fact that the name of the indorser is wrongly spelled does not vitiate the indorsement. (*Leonard* v. *Wilson*, 2 Cr. & M., 589 ; S. C., 4 Tyr., 415 ; *Dunn* v. *Clements*, 7 *Jones* [N. C. Law], 58.) In the first of these cases " Farley " was spelled " Farelly," and the indorsement was held to be sufficient to pass the title. The fact that these bonds were taken with the name " Jonathan " misspelled, was consistent with the defendant's good faith. It is a matter of common knowledge that the soldiers who received these bonds were in many cases persons of but little education, quite likely to spell common words wrongly, and particularly proper names. They seldom had occasion to write their names or to transact such business as the present. At the time when these bonds were negotiated such instruments were frequently presented by this class of persons, soiled in their appearance, and in quite different plight from commercial paper held continuously in the possession of mercantile men. These facts tended to

quiet suspicion if any was likely to arise.  Nor was there any such lack of due caution as to lead to the suspicion of bad faith in the matter of identification of the person presenting the bonds.  All the circumstances being considered, it was enough if there was reasonable ground to suppose that the presenter of the paper was the payee.  It would be inconvenient and impracticable to hold as a rule that a person identifying another should be of the highest character.  The correct view is that it is enough if that person whose representation is made would be regarded as sufficiently trustworthy by a person of ordinary prudence.  The same general remark may be made of the erasure.  An erasure on the back of an instrument of this kind, is not to be treated in the same way as if it were made on its face.  There may be writing there for various reasons, as for example, indications of partial payment, or memoranda of the address of parties, or of the ownership of the securities and the like.  It is held in *Finney* v. *Turner* (10 Mo., 207), that in an action on a note it is not necessary to explain an erased indorsement, which may have been, as already shown, a mere memorandum.  At all events, the mere fact of an erasure is not of itself evidence of an irregularity in a transfer so as to impute bad faith to a holder. (*Birdsall* v. *Russell*, 29 N. Y., 220.)  It must be of such a nature as to arouse suspicion.  In the present case, no one would suspect that the indorsement had been erased and a forged one substituted in its place, as that would be contrary to the apparent interest of any holder, as its tendency would naturally be to render negotiation more difficult.  Where the alteration is against the holder's interest, there is strong evidence that it was not wrongfully made.  (2 Parsons on Bills, etc., 565, 582 ;. *Humphreys* v. *Guillow*, 13 N. H., 385.)  Its natural effect would be to disarm suspicion.  The bonds were exhibited to the court on the argument by consent of counsel. The erasures were not of such a kind as readily to attract attention, or to justify an inference of bad faith on the defendant's part.  The attempt to. prove that he had notice of the theft failed.

This examination results in a complete adoption of three principles, which are said, by a well known writer, to be devised for, and well adapted to secure the unrestricted circulation of negotiable securities. 1. That, though at common law no man can acquire a title to any personal chattel from one who has no title to it himself, except by purchase in market overt, a complete exception to this rule is made in favor of negotiable paper. 2. The *bona fide* holder of a lost, stolen or tortiously transferred note or bill, transferable by mere delivery, and not overdue or otherwise apparently dishonored, who has taken it without knowledge or actual or constructive notice of the loss or fraud, in the usual course of business, and for a full and valuable consideration, has a perfect title to that note or bill against the world, and becomes, by the taking of it, its true owner. 3. The title of such a holder is not defeated by proof that he was negligent, or even grossly negligent, in taking the note or bill, and he omitted to make inquiries, which common prudence would have dictated. But while gross negligence is not itself *mala fides*, it may be evidence thereof for a jury.

On the whole, it was the duty of the court at the circuit to have directed the jury to find a verdict for the defendant.

The order of the General Term granting a new trial should be reversed, and judgment entered for the defendant upon the verdict.

All concur with EARL, C., except DWIGHT, C., dissenting. GRAY, C., not sitting.

Order affirmed, and judgment absolute against defendant.