McLoskey *v.* Gordon.

---

## PATRICK McLOSKEY *v.* ROBERT GORDON.

The rule laid down on the subject of interlocutory decrees to accounts is, that the facts in relation to the account should not only be put in issue, but there must also be evidence which shows them to be probable, and the equity proper. A fraudulent intent vitiates a purchase made in consummation of the design, as

McLoskey v. Gordon.

against purchasers; and no lien is created under a fraudulent contract. Every one who engages in a fraudulent scheme forfeits all right to protection at law or in equity; for the law does not so far countenance a fraudulent contract as to protect the perpetrator to the extent of his investment. *Stovall* v. *Farmers and Merchants Bank*, 8 S. & M. 316.

G. was not entitled either at law or in equity, to a repayment of the sum he bid for the land at the sale under the trust deed; and it was error to award an account to be taken.

IN error from the northern district chancery court at Holly Springs; Hon. Henry Dickinson, vice-chancellor.

Patrick McLoskey filed his bill in the district chancery court at Holly Springs, against Gordon, for certain land.

The bill charges that sometime in the year 1836 or 1837, G. and J. Wightman and Robert Gordon formed a partnership to purchase and deal in lands reserved to the Chickasaw Indians, under the treaty of the 24th of May and 1st of July, 1834; that, by the terms of said partnership, G. and J. Wightman were to advance twenty thousand dollars, and Gordon also to advance a like sum. That this agreement was complied with by both parties, and that, in pursuance of the objects of said partnership, John Wightman proceeded to purchase, and did purchase of different Chickasaw reservees certain lands, among which were sections 20, 28, 29, and 33, in township 12 of range 6 east, which sections were purchased of Myuta-ho-yah, an Indian, the widow of Levi Colbert, and her children, they being the heirs of Levi Colbert; that said lands had been granted to Levi Colbert under the provisions of the fifth article of said treaty; that said Wightman paid for said lands to the said widow and her children $12,000; that the said widow and heirs executed a deed to said Wightman for said lands, with the certificate of the chief, required by the treaty; and that Benjamin Reynolds, the Chickasaw agent, being absent at that time, the deed was afterwards given to him that the same might be certified to by him according to the provisions of the treaty; and that said Reynolds lost or mislaid said deed, so that it never has been found, of all which Gordon had notice early in the year 1839. That on the 20th of March, 1838, there was a dissolution of said partnership and a division of said lands,

and that sections 20 and 29 fell to Wightman, and sections 33 and 28 fell to Gordon. That after this division, John Wightman, on the 17th May, 1836, sold and conveyed to Philip McLoskey, in liquidation of a debt due from G. & J. Wightman to said McLoskey, among other lands, sections 20 and 29 of township 12 of range 6 east; and that complainant purchased from said Philip McLoskey said sections 20 and 29 on the 27th of February, 1840. That Wightman, on the 8th of May, 1838, executed a deed of trust on section 20 and other sections of land to one John G. English, trustee, to secure certain debts due by them to B. M. & J. D. Bradford, which deed was recorded on the 8th of August, 1838, in the clerk's office of Monroe county. That the said Wightman had paid off all the debt due B. M. & J. D. Bradford, except a small balance of $1,000; that said English, on the 21st of May, 1841, sold said section 20, under said trust deed, to satisfy said balance, and that said Gordon became the purchaser of said section 20 at said sale, at the sum of $500, and that said English executed a deed for said land to said Gordon, which said deed bears date the 7th of June, 1841, and was duly proven and recorded. The bill further states, that the agent of the Chickasaw nation, Benjamin Reynolds, having lost the deed executed by the widow and heirs of Levi Colbert to the said Wightman for the said lands, the said Wightman employed an agent to go west, in order to procure another deed to said sections 20 and 29; that the said agent did procure another deed from the said widow and heirs to said Wightman, which deed was also certified to by two of the chiefs of the Chickasaw nation, according to the provisions of the treaty; but that the certificate of the agent was not obtained, on account of his absence from the agency. That in the summer or fall of 1841, the said Gordon having business west, the said Wightman, upon the request of the said Gordon, intrusted the said deed to him to have the same perfected; that the said Gordon, upon his arrival at the agency west, suppressed said deed, and, by fraudulent representations, procured a deed to be executed by the said widow and heirs to him, the said Gordon, and also obtained, by like fraudulent representations and deceitful statements, the necessary and requi-

site certificates to said deed.  That said Gordon did not pay one cent to the grantors as a consideration for the said deed, but that the said deeds were obtained by fraudulent, deceitful, and false representations upon the part of said Gordon.  That said Gordon paid the Indians $20 each for attending the chiefs at the agency, but that said deeds were not executed to said Gordon upon any new consideration, but solely and wholly upon the consideration paid before by said Wightman.  That the said Gordon, at the time of the sale of said section 20, at the said trust sale, in order to prevent persons from bidding at said sale, proclaimed that he had authority from said Wightman to bid said land in for said Wightman, and requested persons not' to bid for the said land; and that, in consequence of these statements by said Gordon, said land was struck off to him at $500.  That, upon a settlement made by said Gordon with Wightman, as late as 1845, said Gordon forced said Wightman to pay the said $500 and the costs of said sale, and also the sum of $1,687.15, the amount charged by said Gordon for expenses and trouble in going west and procuring deeds to said sections of land in his own name.  That said Gordon refused to deliver to said Wightman the said deed so intrusted to him, or to relinquish the titles he held to said lands.  That complainant has paid the taxes on said lands regularly since he purchased them, and that said Gordon had full knowledge that said sections 20 and 29 had been purchased by said Philip McLoskey for a valuable consideration, and that the same had been purchased by complainant for a valuable consideration previous to the purchase of said section 20 at said trust sale, by him, said Gordon.  That Wightman could long since have perfected the title of said lands, but for the fraudulent practices of Gordon.  That said Philip McLoskey purchased of Wightman, and complainant of him, the said lands, without any notice of the existence of the title under which Gordon claims; nor did complainant ever hear of the existence of said titles until within the last twelve months.  That said Gordon has taken possession of said sections 20 and 29, which are now worth the sum of $25,000, and refuses to surrender them or account for them.  Complainant prays that it may be decreed

that the said Gordon be held as a trustee with respect to the said sections 20 and 29, township twelve, range 6 east, and the legal title may be divested out of said Gordon and vested in said complainant and his heirs, and also for general relief.

The answer admits the partnership as stated in the bill, and also states that the parties were connected together for many years as partners in trade and merchandise, prior to the formation of the partnership mentioned in this bill. The answer also admits that each were to furnish $20,000, as stated in the bill, but denies that this agreement was complied with by both parties, and states that Gordon furnished $25,000, and that the Wightmans furnished less than $20,000, the sum of $12,000, the amount which the answer states was to be paid for sections 20, 28, 29, and 33, being a part of the money claimed to be advanced by the said Wightmans, and that only $5,000 or $6,000 of said sum was really advanced. The answer further admits the purchase of the lands and the payment of the same, except the lands bought of the widow and heirs of Levi Colbert. That most of the titles were made to John Wightman, but not all, some being made to defendant. That Wightman purchased for the firm the sections 20, 28, 29, and 33, in township 12, range 6 east, at the sum of $12,400, and not $12,000, as stated in said bill. The answer denies that the whole of this amount was paid, and states that only $5,000 or $6,000 was really paid. The answer further admits that a deed was made by some of the heirs of said Colbert, but states that Reynolds and Carroll, the agents, objected to approving the same, because some of the heirs had not signed it, and because the necessary receipts and vouchers for the full payment of the money had not been furnished. That said deed was afterwards, in 1838, presented to said Reynolds, who was still not satisfied with it, but took it, and that it was afterwards lost or mislaid, but that it never was ratified or approved. The answer also states that said deed had not the signature of two chiefs of the Chickasaw nation. Admits that he was informed of the purchase of said lands, and the execution of a deed by some of the parties, its non-approval and loss, and denies that all the heirs of Colbert signed the same.

The answer also admits the dissolution of the partnership and the division of the lands as stated, and that sections 20 and 29 were allotted to G. & J. Wightman, and sections 28 and 33 to Gordon; but the answer also states, that, at the time of said division, all the money had not been paid for said four sections by said Wightman, and that this fact was spoken of at the time of the division. It also admits the indebtedness of the Wightmans to Philip McLoskey, and the sale to him of the lands mentioned in said bill, and the conveyance by said McLoskey to complainant of said sections 20 and 29; that the said section 20 was conveyed in trust, as stated; and that the same was sold, under said trust deed, and purchased by respondent for $500. The answer denies that this purchase was made for Wightman, but states it was made for respondent; it also admits that it may be true that the agent who lost the deed may have given the certificate mentioned; but it denies all knowledge of Wightman sending an agent west to procure a deed, or that respondent, in the summer of 1841 or at any other time, agreed to take the last-mentioned deed and get it perfected, or that said deed was delivered to him, or that he ever suppressed said deed, and that all the charges in reference thereto are false and untrue. The answer further states, in reference to this matter, that the two sections 20 and 29, and the two sections 28 and 33, were unpaid for, and the title imperfect; and in order to secure his title to said sections 28 and 33, and also to secure a further indebtedness to him of $8,000 from said Wightmans, respondent agreed with said Wightmans to go west and have the titles to all of said four sections perfected to respondent in respondent's name; that respondent did go west, and after great trouble and expense, obtained the deed, he, respondent, paying the balance of the purchase-money to said Indians; and denies that he made any fraudulent or deceitful representations whatever to procure said deed. The answer admits that respondent paid the expenses of some of the Indians to get them to go to the chiefs, but denies that it was paid to them as a bribe. It also denies that respondent made the statements at the trust sale of section 20, as stated, or that he ever exacted or received from the Wightmans the

said $500 and the costs of said sale, or his expenses in going west to perfect said title; the answer also admits that respondent knew the state of the title to said lands at the time of the division, and also admits that he had heard that Wightman had conveyed said lands to McLoskey. The answer also states that McLoskey, at the time he took the deed, knew the state of the title; that it was incomplete, and that all the purchase-money had not been paid, and that Wightman informed McLoskey of these facts, but promised he would pay out the lands and perfect the title. The answer then sets up an indebtedness from the said Wightmans to respondent of $8,000, and that sections 20 and 29 were taken in payment of this indebtedness; and also of $7,000, the purchase-money paid by respondent to the Indians for said land. The answer denies that the land is worth more than $12,000, and claims a lien in equity upon said land for said sums of $8,000 and $7,000, the money due from said Wightman, and the balance of the purchase-money advanced by respondent.

*Word*, *Freeman*, and *Swan* for appellant.

Gordon was guilty of fraud, and entered into a combination to defraud complainant and his vendor. *Henry* v. *Fullerton et al.* 13 S. & M. 631, 634, as to fraud in fact; also 10 Johns. R. 457, as to Gordon having notice of McLoskey's deed. Being guilty of fraud in fact, he is not entitled to any reimbursement of the money advanced by him; nor is he entitled to a lien upon the lands for the money so advanced, or for any responsibilities incurred by him. *Sands et al.* v. *Codwise et al.* 4 Johns. R. 536, 585, 595, 598, and 599; *Smith* v. *Loader*, 10 Prec. in Chan. 80; *Strike* v. *McDonald*, 2 Har. & Gill, 191; *Stovall* v. *Farmers and Merchants Bank*, 8 S. & M. 305, 313, 316.

The court below was right in declaring that Gordon held the land in trust for complainant, and in decreeing that the lands should be conveyed to him. Gordon, with a full knowledge of the title of complainant, by fraud obtains a deed to the lands in question, and sets up that title against the complainant. The exhibits to the bill show that the deed from Wightman to Philip McLoskey was recorded before the other conveyance

from Wightman. The dates stand thus: Gordon and Wightman purchased from Colbert's heirs, in 1836, at $12,000. They dissolved, and divided the lands between them, on 20th March, 1836. Wightman, on this division, got sections 20 and 29, and on the 17th of May, 1838, conveyed to Philip McLoskey these two sections, with several others, at $35,000, and the deed was recorded on that day. Philip McLoskey conveyed to complainant 17th February, 1840. Wightman conveyed section 20, in trust, the 8th of May, 1838; but it was not recorded until the 8th of August, 1838. This statement of the dates of the deeds and the record thereof, and the fact that Gordon had full knowledge of all of them and their dates, as well actual as constructive (they being of record), and that he was apprised that the full consideration had been paid by Wightman to the Indians in 1836, and had taken a deed at that date, — all bring home to Gordon a knowledge of the state of the facts which precluded him from taking a deed from the Indian vendors to himself. These facts, and a knowledge of them on his part, constitute him a trustee for complainant; and the trust in his hands being satisfied, he must convey to complainant. *Niles et al.* v. *Anderson,* 5 How. Miss. R. 365, 381; *Brown* v. *Weast et al.,* 7 Ib. 181; *Runnels* v. *Jackson,* 1 Ib. 358; *North Hampstead* v. *Hampstead,* 2 Wend. 103.

It is insisted that this court, in reversing the case, should now render the proper decree which should have been recorded in the court below. *Henry* v. *Fullerton,* 13 S. & M. 631, 634; H. & H. 532, § 9.

Gordon claims nothing in his answer for expenses in perfecting the title. He claims a precedent debt from the Wightmans of $8,000, and a balance of purchase-money of $7,000, making $15,000; and neither the pleadings nor proof entitles him to the expenses.

He is not entitled to the $500 paid at the trust sale, and its interest, because the deed was not recorded, and because there is no claim set up to it in his answer. And the defendant being guilty of fraud in fact, he is entitled to no lien on the land for moneys pretended to have been advanced. *Sands et al.* v. *Codwise et al.* 4 Johns. R. 536, 585, 595, 598, 599; *Smith* v.

McLoskey v. Gordon.

*Loader*, Prec. in Chan. 80–89; *Stovall* v. *Farmers and Merchants Bank*, 8 S. & M. 305, 313, 316; *Strike* v. *McDonald*, 2 Har. & Gill, 191; *Henry* v. *Fullerton*, 13 S. & M. 631–634; *Jackson, ex dem. Gilbert* v. *Burgess*, 10 Johns. R. 457, as to notice of registered deed; *Niles et al.* v. *Anderson*, 5 How. Miss. R. 365, 381; *Brown* v *Weast et al.* 7 Ib. 181; *Runnels* v. *Jackson*, 1 Ib. 358; *North Hampstead* v. *Hampstead*, 2 Wend. 109; Hutch. Code, 606, § 5; *Lyon* v. *Sanders*, 1 Cushm. 530, 535; *Parkhurst* v. *McGraw*, 2 Ib. 134–136; *White* v. *Trotter*, 14 S. & M. 30.

*W. F. Stearns* for appellee.

The land in question was purchased by the Wightmans from the Indians in 1836; and we have already seen that, whether the purchase-money was or was not all paid at the time of the purchase, nothing more than an equitable title was acquired under that purchase, inasmuch as the Indian deed to John Wightman lacked the certificates and approval required by the provisions of the 4th article of the Chickasaw treaty.

According to the state of facts presented by the brief of the adverse counsel, John Wightman's deed of trust to English, conveying section 20 as a security for the payment of a debt due from the Wightmans to B. M. & J. D. Bradford, was executed on the 8th day of May, 1838. Of course, that conveyance operated to vest in English, the trustee, the entire equitable interest of the Wightmans in the land, whether that interest were a perfect or an imperfect equity. There was no necessity for recording that deed of trust at all, as I conceive, because, inasmuch as the interest of the Wightmans in the land was but an equity, any person, who might subsequently purchase from them their pretended interest, would take the same subject to the prior equitable claim of the Bradfords under the deed of trust. An equity is liable, with or without notice, in the hands of the assignee, to all equities which could be enforced against the assignor. *Healey & Whitney* v. *Alston*, 3 Cushm. 190; Dart, Vend. & Purch. 392, 393. We here see that a *bonâ fide* purchaser of an equitable estate, without notice of a prior purchaser's right, takes it subject to the prior equity. 7 Peters, 271; 2 Cond. R. U. S. 617; 2 J. R. 594.

How did McLoskey here acquire his title? On the 17th day of May, 1838, nine days after the execution of the deed of trust to English, John Wightman conveyed section 20 to Philip Mc-Loskey, under whom Patrick McLoskey claimed his title. At the date of that conveyance to McLoskey, John Wightman was not only not clothed with the legal title to the land, but he was not even the owner of a perfect equitable estate in the land. His equity had passed to English (or the Bradfords) under the deed of trust, and his sole remaining interest in the land consisted in his contingent interest in any surplus that might remain after discharging the debt to the Bradfords. My opponents contend that McLoskey was a purchaser, for valuable considera-tion, without notice of the deed of trust. In point of fact, he may have had no actual notice of the deed of trust; but, as we have already seen, the question of notice is unimportant, so far as a purchaser of an equity is concerned, and McLoskey was the purchaser of nothing more than a mere equity. Besides, Wightman did not have the legal title to the land, nor did McLoskey pay any money for the lands, but took a conveyance of it in part payment of a precedent debt due to him from the Wightmans. It is not alleged or proved that McLoskey re-linquished any security for the payment of that precedent debt. He is not, therefore, a purchaser for a valuable consideration. 4 S. & M. 257. And even if he were a purchaser for a valua-ble consideration, without any notice of the deed of trust, that circumstance could not aid him in this difficulty. He is the complainant here. If he were a defendant, he might use the plea as a defence; but a party complainant has never yet been permitted, I believe, to obtain relief in a court of equity upon the ground that he was a purchaser without notice. 9 Vesey, jr., 31; 3 Sugden, 349, 350; 4 Dessaus. 288; 1 Cow. 642; 3 Vesey, jr., 225; Ambler, 292.

It is urged that, inasmuch as Gordon has been guilty of a fraud, in taking to himself the legal title to the lands in con-troversy, he ought to lose all that he paid to obtain that title; and they cite authorities in support of their position. Those authorities, I admit, show what the rule in such cases is at law; but in equity a different rule prevails, and if a party who

23*

comes into a court of equity to obtain the legal title to property which has been fraudulently acquired by another, has been benefited by the payment of money by the fraudulent holder of the legal title, he must refund as much as can be shown to have enured to his benefit. This principle has been recognized and acted on by this court in several cases. *White* v. *Trotter*, 14 S. & M. 45, 46; 12 Ib. 191; 13 Ib. 723.

Mr. Chief-Justice SMITH delivered the opinion of the court.

This was a bill filed in the vice-chancery court for the northern district, by Patrick McLoskey, to procure a conveyance of two sections of land, the legal title to which was alleged to be held by the respondent Robert Gordon. By an interlocutory decree the legal title to the lands in controversy was determined to be in Gordon, and that he held the same in trust for the complainant; and further, that the former should have a lien upon the lands for certain moneys expended by him in procuring a conveyance of the same from the original vendors. It was also further ordered, that an account should be taken and stated between the parties. An account was accordingly taken and stated, to which exceptions were filed by both the complainant and respondent. The report being amended agreeably to the directions of the chancellor, it was confirmed, and a final decree was rendered, by which Gordon was required to convey the lands to McLoskey, upon the payment by the latter to the former, of the sum of $2,292.64; to this decree both parties sued out writs of error to this court, and both causes have been argued and submitted together.

The first question arises upon the interlocutory decree. It is insisted, that under the pleading and proofs it was error to order an account to be taken in the case.

Assuming that the answer was so framed, that an allowance could have been legitimately made for the expenses averred to have been incurred by respondent, in procuring the conveyance from the heirs of Colbert, let us inquire whether a foundation was laid for an interlocutory decree to account, for if that was not done, the decree was erroneous. The rule on the subject is, that the facts in relation to the account should not only be

put in issue, but there must also be evidence which shows them to be probable, and the equity proper.

·It appears that respondent, with George and John Wightman, formed a copartnership in 1836 or 1837, for the purpose of purchasing and dealing in lands reserved to the Indians, under the treaty of the 24th of May and 31st of July, 1834, made with the Chickasaws. By the terms of the partnership, the respondent was to furnish $20,000, and the Wightmans jointly the like sum. But respondent furnished in fact $25,000, whilst the Wightmans furnished less than $20,000. John Wightman, in pursuance of the partnership agreement, purchased from the heirs of Levi Colbert four sections of land, embracing the two sections in controversy, for which he paid the sum of $12,000. A conveyance for these lands was made to him by a part of the vendors; and the deed, which was afterwards lost, was not approved by the agent, because all of the heirs of Colbert had not joined in its execution. These lands were divided in 1838, and the two sections in controversy fell to the share of the Wightmans.

There is a conflict in the testimony in regard to the fact, whether the whole of the purchase-money had been paid by Wightman; but if the whole of the purchase-money was not paid, the respondent was cognizant of that fact at the time of the divisions. Prior to the transactions with the complainant, the Wightmans were indebted to the respondent seven or eight thousand dollars.

By a deed of trust, dated the 8th of May, 1838, Wightman conveyed one of the sections of land in controversy, to wit, section 20, of township 12, range east 6, with other lands, to J. G. English, in trust, to secure certain debts which he owed to J. D. and B. M. Bradford. This deed of trust was not filed for record until the 7th of August following. On the 17th of May in the same year, Wightman sold and conveyed by deed in fee-simple, the said section with the other land in dispute, to Philip McLoskey, who was a *bonâ fide* purchaser for a valuable consideration, without notice of the deed of trust previously executed to English. McLoskey filed this deed for record on the day it was executed; and on the 27th of February, 1840, sold and conveyed in fee these lands to complainant.

McLoskey *v.* Gordon.

The respondent knew that the original deed from the heirs of Colbert to John Wightman had been lost; and he had actual, as well as constructive, notice of the sale and conveyance by said Wightman to Philip McLoskey. In the fall of 1841, respondent, in possession of full knowledge of these facts, went west of the Mississippi River, whither the Chickasaws had removed. Whilst there, he induced the heirs of Colbert and Myuta-ho-yah, his widow, to join in a deed conveying the lands in controversy to himself. He told them that their deed to Wightman was lost. He persuaded them that it was right and proper for them to execute a new deed, because the original had been lost; and assured them that such was the custom among the whites. He paid nothing to the heirs as purchase-money, to induce them to comply with his request. It was alone by these representations and by means of the original sale to Wightman, that he was enabled to succeed in procuring a conveyance to himself. There were two other sections, to wit, sections 28 and 33, lying in the same township and range, which were purchased from the Colbert's by Wightman, and embraced in the lost deed, which, upon the partition between him and respondent in 1838, fell to the share of the latter. The titles to these sections were consequently in the same situation; and the new deed which respondent obtained, embraced them as well as those which are the subject of this suit. There are no specific statements in the answer, in regard to the amount of the expenses incurred by respondent in procuring the deed; but it was in proof, as a part of his statements which were offered in evidence by the complainant, that respondent had expended for that purpose $1,500.

From this recital of the evidence it is to us manifest, that respondent had no equitable claim to remuneration for his trouble or the expenses incurred in procuring the deed. He was fully apprised of the conveyance by Wightman to Philip McLoskey, and had constructive notice of the conveyance by him to complainant. He might have supposed that that had not passed the legal title; but he knew McLoskey had a valid equitable title to the lands. He made use of the original sale to Wightman to procure a deed to himself. And although his

primary object may have been to secure his demand against the Wightmans, the act was directly prejudicial to the interests of McLoskey, and, as it was performed with a full knowledge of his rights, it must be held fraudulent.    And if fraudulent, it constitutes no foundation for the claim to reimbursement on account of the expenses incurred by respondent.

The rule on this subject is laid down by this court in the case of *Stovall* v. *The Farmers and Merchants Bank of Memphis*, 8 S. & M. 316, in which it was said by the late chief-justice, that " a fraudulent intent vitiates a purchase made in consummation of the design as against purchasers.    We know of no rule which gives a lien under a fraudulent contract.    Every one who engages in a fraudulent scheme, forfeits all right to protection at law or in equity.    The law does not so far countenance fraudulent contracts as to protect the perpetrator to the extent of his investment.    This would be to hold out inducements to engage in schemes of fraud, as nothing could be lost by a failure to effectuate the entire plan."    It may be said in the case at bar, that the complainant was not ultimately injured by the acts alleged to be fraudulent.    If such be the fact, it was certainly not the intention of the respondent, that they should prove beneficial to him, and cannot exempt the case from the rule, that an act of fraud can never constitute the foundation of relief in a court of equity.

Nor do·we think the sale made by English under the trust deed, at which respondent became the purchaser, entitled him to either a lien upon the land, or reimbursement to the amount of his bill.    McLoskey had no notice of the trust deed under which the sale was made, had purchased the lands, and took a deed from his vendor, which purported to be a conveyance of the land in fee.    It was recorded on the day it was executed, and took effect from that date; whereas the trust deed, although of prior date, did not take effect until it was filed for record, which was not done until more than two months had elapsed after the execution of the deed to McLoskey.    But, if it were admitted that the registry act does not apply, and hence, that a *bonâ fide* sale under the deed in trust would pass whatever title was vested in the trustee, the respondent would not occupy a more favored position.

McLoskey *v.* Gordon.

The deed of Wightman to McLoskey, upon this supposition, if it did not convey the fee, in consequence of Wightman's defect of title, or of the prior deed of trust, was certainly so far operative as to vest in McLoskey the equity of redemption. Hence he had a right to force a legal title, by paying off the incumbrance imposed by the trust deed, at any time before a foreclosure and sale. This right was defeated by the sale, unless void as to McLoskey, in consequence of the alleged fraudulent conduct of the respondent. And if void for that reason, he can claim neither a lien upon the land, nor a repayment of the purchase-money.

The proofs in regard to the conduct of the respondent, leave no room to doubt, that the sale was void as to creditors and the person holding the equity of redemption.

The land at the trust sale was worth upwards of $3,000. It was sold for $500 to the respondent, who bid that sum. Persons were induced not to bid for the land by the respondent, who proclaimed that he wished to buy in the land for the Wightmans, and exhibited a letter from them, authorizing him to buy it. There was evidence which tended strongly to show that it was not the real intention of the respondent to purchase the land for the benefit of the Wightmans, but to secure it for himself. If so, his acts' were fraudulent in a double sense. And it is in proof, that the land was sold greatly below its value in consequence of those acts. We hold that he was not entitled to a repayment of the sum he bid at the sale. 8 S. & M. 316.

Entertaining this view of the transactions connected with the procurement of the deed from the widow and heirs of Colbert, and the sale under the trust deed, we think the vice-chancellor erred in ordering an account to be taken. But, in regard to the main question, we think the decree was right. We think it was properly holden that the legal title to the lands was in the respondent, and that the complainant clearly is entitled to a conveyance of that title. We, therefore, reverse the decree, and order the decree which the court below should have rendered to be entered in this court.