# J. IRVING PEARCE

## *v.*

## IRA FOOTE.

*Filed at Ottawa February 7, 1885.*

1. GAMBLING CONTRACTS — *dealing in options.* Section 130 of the Criminal Code declares: "Whoever contracts to have or to give to himself or another the option to sell or buy at a future time any grain or other commodity," shall be subject to a fine or imprisonment, and "all contracts made in violation of this section shall be considered gambling contracts, and shall be void."

2. SAME — *what is an "option."* An "option" is what are called, in the language of the dealers, "puts" and "calls." A "put" is defined to be the "privilege of delivering or not delivering" the thing sold, and a "call" is defined to be the "privilege of calling for or not calling for" the thing bought. "Optional contracts," in this sense, are usually settled by adjusting market values, as the party having the "option" may elect. It is simply a mode adopted for speculating in differences in market values of grain or other commodities. It is in this sense the term "option" is used in the statute.

3. SAME—*what constitutes a gambling contract.* In this case a person entered into a contract with a broker by which the latter was to take options, in his own name, and if there were profits the broker was to pay them to the other contracting party; if losses, the latter was to pay them,—the broker to receive a commission for his services. No property was to be bought or sold. The trade was to be in differences and in options alone, and to settle upon profit and loss upon the fluctuations of the market,—guessing or betting on it. This was held to be a gambling contract, and within the inhibition of the statute.

4. SAME—*what contracts connected with a gambling transaction are within the statute.* Section 131 of the Criminal Code declares void all promissory notes, bills, or other securities made, or given, or executed, where any part of the consideration thereof is money or any valuable thing won by wager upon any unknown or contingent event whatever, or made, or given, or executed, for reimbursing any money knowingly lost or advanced, at the time and place of such bet, to any person so betting.

5. So where a person met with losses under an "optional contract," and in adjusting such losses, transferred to his broker through whom and in whose name the deal was made, certain promissory notes which he held, with his guaranty thereon, it was *held,* the assignment and guaranty of the notes were void, not only in the hands of the immediate assignee, but also in the hands of another to whom the latter might transfer the notes without value, as, in the case of an assignment for the benefit of creditors.

6. SAME—*recovering back money, etc., paid in a gambling transaction— who regarded as the "winner," in dealing in "options."* Section 132 of the Criminal Code gives a remedy to recover back from the "winner" in a gambling transaction any money or property paid to him on account of such transaction.

7. In a suit brought to recover the value of a promissory note alleged to have been delivered in payment of losses in a gambling transaction, it appeared that the plaintiff had entered into an "optional contract" with a broker, the latter to take "options" for account of the plaintiff, but in his own name, and in case there were losses, the plaintiff was to pay them, and if there were profits, he was to have the benefit of them, the broker to have a commission in either event. Losses having resulted, in adjusting the differences, the plaintiff transferred the note, which he held, to the broker, in payment. It was *held,* the broker was a "winner," within the statute, and the action would lie.

8. The broker could not be regarded as the "agent" of the plaintiff in a transaction of that character, in any such sense as would exonerate him from the statutory liability to refund that which he had received. There is and can be no such thing as "agency" in the doing of any unlawful act.

9. Or, giving the contract the construction that the plaintiff should reimburse the broker for any losses he might sustain in optional or gambling contracts on the board of trade, in consideration that if any gains should be

made in such dealing, the broker would pay the same to the plaintiff, and the plaintiff would pay him a commission for his services,—still the transaction would be a mere wager, and within the statute which gives a remedy to recover back money paid thereon.

10. SAME—*to whom the statutory liability will attach, and in what capacity.* The note which was received by the broker, in this case, on the settlement of the differences in the option deal, was included in an assignment by him to another for the benefit of creditors. Demand was made upon such assignee by the owner who had transferred the note to the broker, for its surrender, which was refused. The suit by the loser to recover back his note, or its value, was brought against this last holder, the assignee for the benefit of creditors, not in his representative character as such assignee, but as an individual. The action was well brought, and it was proper that judgment be entered accordingly.

11. SAME—*as to the rule of construction of the statute.* Although the statute prohibiting the dealing in options is highly penal in its character, there is no warrant for construing it with any unreasonable strictness. It ought rather to have a just, if not liberal, construction, to the end the legislative intention may be accomplished,—to prohibit all dealings in options in grain or any other commodities.

12. PLEADING—*declaration in trover to recover back the value of property won under a gambling contract.* In trover to recover for property delivered in payment of losses under a gambling contract, it was objected, on error, that the declaration did not contain the words, "whereby an action hath accrued to the plaintiff according to the form of this act." The declaration was in the usual form in trover, and was held to be sufficient in law to support a judgment in trover, although the action was really brought under the statute.

13. SAME—*defective pleading cured after verdict.* But if the declaration were insufficient by reason of not being framed under the statute, the objection comes too late after verdict, as the supposed defect could have been reached by special demurrer.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. THOMAS A. MORAN, Judge, presiding.

This suit was brought in trover by Ira Foote, in the circuit court of Cook county, against J. Irving Pearce, to recover the value of a promissory note for the sum of $5000, made by the trustees of the estate of Ira Couch, deceased, and payable to the order of Ira Foote, which note was assigned by the payee

to S. G. Hooker & Co., and by indorsement thereon the payee guaranteed the payment of the note at maturity. To the declaration, which is in the usual form in trover, defendant pleaded not guilty, and on the trial before the court, without a jury, the court found the issues for plaintiff, and assessed his damages at $7265, being the full amount of the principal of the note, and interest to the date of the judgment, and entered judgment accordingly. Defendant excepted to the finding and judgment of the court. At the same term of court defendant entered, among other motions, one to vacate the judgment entered, and grant him a new trial, which motion was supported by affidavit as to newly discovered evidence, but the motion was overruled, and to that ruling of the court defendant also excepted. The judgment so entered against defendant was afterwards, on his appeal, affirmed in the Appellate Court for the First District, and he brings the case to this court on his further appeal.

Messrs. DENT & BLACK, and Messrs. LYMAN & JACKSON, for the appellant:

The parties having been *in pari delicto*, at common law there can be no recovery. Broom's Legal Maxims, *692; *Dixon* v. *Olmstead*, 9 Vt. 310; *McBlair* v. *Gibbs*, 17 How. 232; *Worcester* v. *Eaton*, 11 Mass. 368; *McCullum* v. *Gourley*, 8 Johns. 147; *Foote* v. *Emerson*, 10 Vt. 338; *Lubboch* v. *Potts*, 7 East, 449; 2 Parsons on Contracts, 747; *Best* v. *Strong*, 2 Wend. 325; *Tennant* v. *Elliott*, 1 B. & P. 2; *Howson* v. *Hancock*, 8 T. R. 575; *Pepper* v. *Haight*, 2 Barb. 429; *Brothers* v. *Potter*, 46 Vt. 402; *Evans* v. *City of Trenton*, 24 N. J. 764; *Yates* v. *Foote*, 12 Johns. 1; *Buckman* v. *Bryan*, 3 Denio, 340; *Peck* v. *Briggs*, id. 107.

Section 132 of the Criminal Code has not changed the rule in this case. It authorizes a recovery only from the winner. Hooker & Co. were not winners, if this should be held a gambling transaction.

As to the rulings on options, reference is made to *Pixley* v. *Boynton*, 79 Ill. 351; *Wolcott* v. *Heath*, 78 id. 433; *Logan* v. *Musick*, 81 id. 414; *Sawyer* v. *Taggart*, 14 Bush, 727; *Lehman Bros.* v. *Strassberger*, 2 Woods' C. C. 554; *Hibblewhite* v. *McMorine*, 5 M. & W. 462; *Clarke* v. *Foss*, 7 Biss. 540. See, also, upon this subject, *Rumsey* v. *Berry*, 65 Maine, 570; *Smith* v. *Bouvier*, 70 Pa. St. 375; *Petrie* v. *Hannay*, 3 T. R. 418; *Owen* v. *Davis*, 1 Bailey, 315; *Porter* v. *Veits*, 1 Biss. 177; *Knight* v. *Fitch*, 80 E. C. L. 566; *Rosewarne* v. *Billing*, 109 id. 316; *Gilbert* v. *Gaugar*, 10 C. C. In. 340; *Black* v. *Ferdiman*, 11 C. L. N. 99.

Mr. EMERY A. STORRS, for the appellee.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

This case is one of more than usual importance, on account of the sum involved, which is quite considerable, and on account of the principles involved in the decision. There can be no controversy in this court concerning the facts. They must be regarded as having been settled by the finding and judgment of the trial and Appellate courts. This much is frankly conceded by counsel, and the position is taken, if the case shall now be considered as on a demurrer to evidence,—that is, conceding the truth of all the evidence tends to establish in favor of plaintiff,—the facts do not establish, in law, a right to recover. The defendant does not claim he is an assignee of the note for value. It came to him from Hooker & Co., to whom it had been assigned by plaintiff, among the assets of that firm that were assigned to him for the benefit of their creditors. It is plain the defendant stands in the shoes of his assignors, and in the further consideration of the case it will be most convenient to treat it as though the action had been brought against Hooker & Co. The case naturally falls into two parts: First, is the contract which has been found by the trial court to exist between plaintiff

and Hooker & Co. a "gambling contract," as those terms are used in the statute, and hence void; and second, if the contract shall be held to be obnoxious to the statute, since plaintiff has delivered the note under that contract, can he, under the statute, recover its value from Hooker & Co., or, what is the same thing, from their assignee? At the outset this court disclaims any right to review controverted questions of fact. The issues having been found for plaintiff by the lower court, it will be understood that all the facts the evidence tends to establish in his favor will, as upon a demurrer to evidence, be held to have been so found for him.

Looking into the evidence to ascertain that which it tends to prove, it is seen what the contract is or was between plaintiff and Hooker & Co., out of which the present litigation ultimately sprang. As respects the original contract between plaintiff and Hooker & Co., Mr. S. G. Hooker, a member of the firm, testified that plaintiff said to him: "I don't want to pay for any property. I want to trade in options exclusively. I don't want to pay for any cash grain." To which witness replied: "You shall not. I will trade with you in differences." And again, that plaintiff further said to him: "I don't ever want to pay for any more property. I don't want to carry any more property on the board of trade. I want to trade exclusively in differences in options,—betting on the market." To which witness answered: "I agreed to do just exactly that thing for him." On being asked, "What thing," the witness said, "To trade in differences and in options, and to settle upon profit and loss upon the fluctuations of the market,—guessing or betting on it." Plaintiff states the contract substantially in the same way. He says: "I told him (Hooker) I didn't want to buy any grain, no lard, no pork, or any thing of the kind. He said he could make money in speculation,—for instance, buy for this month for delivery next month, then settle on differences. If there was a loss, I had to pay it; and if there was a gain, he would pay

it to me." The plaintiff further says neither Mr. Hooker nor Mr. Lincoln had any authority from him to deal in any other way except to settle on differences. Hooker says the contract he made with plaintiff was made on behalf of his firm, of which he was the head, and within five or six days after the making of it he informed Mr. Lincoln, his partner, of the arrangement he had made with plaintiff. It is due, however, to Mr. Lincoln, to say that he denies all knowledge on his part that the firm had contracted to deal in options with plaintiff, but it is freely and fully admitted by Hooker the contract was made with the firm, and the trial court must have found such was the contract, and that finding is, of course, conclusive on this court.

It is plain that under the contract between plaintiff and the firm of Hooker & Co., it was not in the contemplation of the parties any actual purchases or sales of grain or other commodities should be made for plaintiff, or on his behalf. Indeed, it was expressly agreed none should be made. All the speculating that was to be done was to be in differences in options,—or, as the parties termed it, "betting on the market." Of course it was expected by the parties that such purchases and sales of grain or other commodities that should be made, were to be made on the board of trade. As was said by this court in *Pixley* v. *Boynton*, 79 Ill. 351, the true idea of an option is what are called, in the peculiar language of the dealers, "puts" and "calls." A "put" is defined to be the "privilege of delivering or not delivering" the thing sold, and a "call" is defined to be the "privilege of calling for or not calling for" the thing bought. "Optional contracts," in this sense, are usually settled by adjusting market values, as the party having the "option" may elect. It is simply a mode adopted for speculating in differences in market values of grain or other commodities. It must have been in this sense the term "option" is used in the statute. Such a contract is obviously fictitious, having none of the elements of good faith,

as in a contract where both parties are bound, and is defined by statute as a "gambling contract." Fictitious purchases or sales, such as were in the contemplation of the parties, were as nothing, and it is a matter of no consequence where it is pretended they were made,—whether on the board of trade or elsewhere. It would have been quite as well, and would have conformed as nearly to the contract of Hooker & Co., had they simply entered upon their books they had made such purchases or sales on behalf of plaintiff, without going upon the board of trade, and claiming they had made such purchases and sales, and on returning made such entries. "Betting on the market" could be done just as well in that way as in any other. It needs no illustration to make it apparent the contract between plaintiff and Hooker & Co., as the trial court must have found it from the evidence, comes exactly within the meaning of section 130 of the Criminal Code, that declares: "Whoever contracts to have or to give to himself or another the option to sell or buy at a future time any grain or other commodity," shall be subject to a fine or imprisonment, and "all contracts made in violation of this section shall be considered gambling contracts, and shall be void." It is seen this statute forbids any one to contract to have, or to give to himself, or to contract to give to another, the privilege to deal in options. That is precisely what Hooker & Co. did. They contracted to give to plaintiff the privilege to deal in options and settle with them upon differences, as indicated or determined by the fluctuations of the market. That is one of the offences against which the statute is leveled. Of course the party who contracts to *have* the option is equally guilty with the party who contracts to *give* it. It is wholly immaterial whether plaintiff knew "optional contracts," such as his agreement with Hooker & Co. contemplated, were defined by statute to be "gambling contracts." His ignorance of the statute in that respect did not change the character of the contract. Undoubtedly, under the contract between the par-

ties, Hooker & Co. may have made fictitious contracts with persons, unknown to plaintiff, on the board of trade, nominally, at least, on behalf of plaintiff, for the purchase or sale of grain, and may be other commodities, which were settled by differences in market values, in which transactions the losses greatly exceeded the profits. Finally, Hooker & Co. rendered plaintiff an account of such transactions, which included losses and commissions claimed to be due to them, growing out of these purchases and sales, amounting to a large sum,— perhaps over $22,000. It appears that plaintiff, by his attorney in fact, in settling this large demand made against him, paid Hooker & Co. $2000 in cash, and assigned to them, with his guaranty of payment written on the back, four notes of $5000 each, made by the trustees of the Couch estate to plaintiff. One of these notes passed to defendant, under the assignment made by Hooker & Co. for the benefit of their creditors, and is the note in controversy. It is admitted that before this suit was brought, plaintiff demanded the note of defendant, and on his refusal to deliver it this action was brought in the circuit court, and the recovery was for its face value and accumulated interest. It is obvious that under section 131 of the Criminal Code, which declares void all promissory notes, bills, or other securities made, or given, or executed, where any part of the consideration thereof is money or any valuable thing won by wager upon any unknown or contingent event whatever, or made, or given, or executed, for reimbursing any money knowingly lent or advanced, at the time and place of such bet, to any person so betting, the assignment and guaranty of the note in controversy to Hooker & Co., under the circumstances proven, was void, and passed no title whatever to them or to their assignee, the defendant. It was so declared by this court in *Tenney* v. *Foote*, 95 Ill. 99.

Assuming, then, as must be done, the facts were correctly found by the trial court, the contract between plaintiff and

Hooker & Co. was, in law, a "gambling contract," and hence void, the question arises on the other branch of the case, whether plaintiff, either at common law or under the statute of this State, can recover that which he paid to Hooker & Co. as money or property lost in a gambling transaction, from defendant, in whose hands the specific property is found. As the solution of this question depends solely upon the construction that is to be given to the statute of this State on this subject, no investigation will be made as to what the common law was in such cases. So much of section 132 of the Criminal Code as has any application to the point being considered, is as follows: "Any person who shall, * * * by any wager or bet upon any * * * contingent event, lose to any person so * * * betting, any sum of money or other valuable thing, (amounting in the whole to the sum of $10,) and shall pay or deliver the same, or any part thereof, the person so losing and paying or delivering the same shall be at liberty to sue for and recover the goods, money or other valuable thing so lost and paid or delivered, or any part thereof, or the full value of the same, by an action of * * * trover, * * * from the *winner* thereof, with costs, in any court of competent jurisdiction." It is said, if it shall be conceded the contract between plaintiff and Hooker & Co. were a "gambling contract," within the contemplation of the statute, this provision of section 132 does not apply to nor does it authorize an action against Hooker & Co., for the simple reason they had not won any money or valuable thing from plaintiff upon any gambling transaction,—or, more tersely stated, the argument is, the note in controversy "was not paid upon a bet or gambling transaction to the *winner* of such bet." The position taken can hardly be maintained. The agreement, as the trial court was authorized to find it, is, that Hooker & Co. contracted to *give plaintiff* the privilege to deal in options with or through them, and "if there was a loss," plaintiff was to pay it to them, and "if there was a gain," Hooker & Co. were

to pay it to plaintiff, and for their services they were to be paid a commission. The suggestion that Hooker & Co. merely acted as the agents for plaintiff in these unlawful transactions, may be rejected at once as having nothing in its support. There is and can be no such thing as agency in the perpetration of crimes or misdemeanors, or, indeed, in the doing of any unlawful act. All persons actively participating are principals. Treating all the parties engaged as principals, it is immaterial to which one the money or property lost was in fact paid or delivered,—whether to Hooker & Co., or to any of the parties on the board of trade with whom they may have made fictitious contracts, and lost,—and paying to either principal is, in law, paying to the "winner." But aside from this view, the contract in express terms provides the losses, if any, should be paid to Hooker & Co., and not to the person with whom they might have had "gambling contracts" on the board of trade, or elsewhere, and the money and note were so paid and delivered to Hooker & Co., as the contract provided should be done. Plaintiff could not know with whom they may have had such transactions. It was a matter about which he had no concern, for the reason he was obligating to pay the losses to Hooker & Co., and to no one else. So far as he was concerned they were the "winners" of his money and property. Plaintiff did not, and could not, know any one else in the transactions. It was from Hooker & Co., and nobody else, that plaintiff obtained the contract to deal in options, and despite all subtle reasoning on this branch of the case, it is apparent Hooker & Co. are the actual "winners" of plaintiff's money and property, and he neither knew nor cared to whom they may have paid any portion or all of that which they obtained from him.

But there is another view that may be taken that leads to the same conclusion,—that is, under the most favorable construction that can be given to the evidence the contract between the parties was, that plaintiff would reimburse Hooker

& Co. for any losses they might sustain in optional or gambling contracts made on the board of trade, in consideration that if any gains should be made in such dealing, Hooker & Co. would pay the same to plaintiff, and that plaintiff would pay them a commission for their services. Such a contract is obviously unlawful, as being inhibited by statute. (Crim. Code, sec. 132.) The wager in this case was upon market values within a given time, or on a given day. What is a wager? It is a contract by which two or more parties agree that a certain sum of money or other valuable thing shall be paid or delivered to one of them on the happening of a certain event. That is precisely what was done in this case. The betting was as to market values within stated periods, and was evidently done by Hooker & Co. with others whom they may have met on the board of trade. It is not probable the parties that won in such transactions from Hooker & Co. had any knowledge of plaintiff. They looked alone to Hooker & Co. for payment of their winnings, and it is said they were paid by Hooker & Co. Plaintiff's contract—if he made any— to reimburse Hooker & Co. for any such losses paid by them, is not only contrary to the statute, but is forbidden by a sound public policy, and is therefore void.

Although the statutes being considered are highly penal, there is no warrant for construing them with any unreasonable strictness. They ought rather to have a just, if not liberal, construction, to the end the legislative intention may be accomplished,—to prohibit all dealings in options in grains or other commodities. Nothing is productive of more mischievous results. Considerable fortunes secured by a life of honest industry have been lost in a single venture in "options." The evil is all the more dangerous from the fact it seemingly has the sanction of honorable commercial usage in its support. It is a vice that has in recent years grown to enormous proportions. Legitimate transactions on the board of trade are of the utmost importance in commerce.

Such contracts, whether for immediate or future delivery, are valid in law, and receive its sanction and all the support that can be given to them. It is only against unlawful "gambling contracts" the penalties of the law are denounced, and no subtle finesse of construction ought to be adopted to defeat the end it is to be hoped may be ultimately accomplished.

The point is made the declaration is not framed under the statute, and is not sufficient in law to support a judgment on the evidence contained in the record. The defect insisted upon is, it does not contain the words, "whereby an action hath accrued to the plaintiff according to the form of this act." The declaration is in the usual form in trover, and was evidently drawn from approved precedents. It is sufficient in law to support a judgment in trover. But if it were insufficient, under the evidence given, that objection ought to have been pointed out on the trial, as should have been done by special demurrer had the facts been stated in the declaration, when an amendment would have been allowable instanter. After verdict the declaration is clearly sufficient, under the statute of "Amendments and Jeofails," (sec. 6, div. 9,) which declares no judgment shall be arrested or stayed after verdict for the want of any allegation or averment on account of which omission a special demurrer could have been maintained. It is now too late to insist upon the objection made, even if it might have been sustained at the trial had it been made specifically.

It is also made an objection to the present judgment it is rendered against the defendant individually, whereas he was sued as assignee of Hooker & Co., and if any judgment in this action was justifiable, it should have been rendered against defendant in his representative capacity, and not otherwise. A sufficient answer to the position taken is, the supposed fact on which the error is assigned has really no existence. Defendant was not sued in his representative character, but

as an individual, for his alleged personal tort. Besides that, if he is guilty of a conversion of plaintiff's property, it is his own wrongful act, and not that of his assignors. It is a matter of no consequence the descriptive appellation of assignee is affixed to defendant's name. It does not indicate he was sued otherwise than for his personal wrongful act. The suit was properly brought, and if it can be sustained it must be done against defendant as an individual, and not against him as the representative of his assignors.

As to the fifth error assigned, viz, the Appellate Court erred in not holding the circuit court erred in denying the motion for a new trial, based upon the affidavits filed and sworn to in the cause, there is clearly nothing in it. The granting of a new trial, under the circumstances disclosed by such affidavits, was a matter resting in the sound discretion of the circuit court, and it is only when this court is able to say there has been an abuse of such discretion, it will interpose. After the fullest and most careful examination, nothing is discovered that would warrant such interference in the present case.

The judgment of the Appellate Court must be affirmed, which is done.

*Judgment affirmed.*

Mr. JUSTICE DICKEY, dissenting:

While there is testimony tending to show that Foote authorized Hooker & Co. to deal in options for him, and on his account, there is not one word of proof tending to show that there ever was, in fact, any dealing in options. The power in that regard was never exercised. Indeed, it is not claimed by counsel for appellee that any options were in fact ever bought or sold. This, however, is not very material, as I concede, and we all agree, that the contracts which were in fact made were merely gambling contracts, and hence were unlawful, and could not be enforced by law.

16—113 ILL.

The facts of the case as claimed by appellee, and as found by the Appellate Court, are as follows: In and before June, 1876, Hooker & Co., as brokers and agents of Foote, at his request made various time contracts on the board of trade in their own names, on account of Foote, nominally, for the purchase or sale of produce at a given price, at a future day, it being understood at the time that no delivery of the produce was intended, but that the matters were to be adjusted by the payment of differences between the contract price and the market price at the time named for delivery. In some of these contracts profits were received, and in others losses were incurred, which Hooker & Co. paid for Foote. The losses exceeded the gains to such an extent that in June or July, 1876, Hooker & Co. rendered to Foote their bill for moneys thus paid out for him, and for commissions, amounting to over $22,000. After some dispute about the amount of the commissions, which was adjusted to Foote's satisfaction, he paid the bill, partly in cash and partly by the sale and delivery to them of certain promissory notes, and on each of which Foote indorsed his guaranty of payment at maturity. These notes were each made by the trustees of the Couch estate, payable to Foote at a future day, and for the sum of $5000. Hooker & Co., having sold all these notes except one, and afterwards failing in business, made a general assignment to Pearce, for the benefit of their creditors, of all their property and effects, and among other things this one note thus passed to Pearce. Foote, after demand made, brought an ordinary action of trover against Pearce for the value of this note. In other words, Hooker & Co., as the brokers and agents of Foote, at his request and in his behalf, made unlawful wagers on the board of trade, and suffered losses, and at his request Hooker & Co. paid these losses. In consideration of this payment of money for Foote, and of the commissions charged by them for transacting this unlawful business for Foote, and for no other consideration, Foote sold and

delivered this note, and others of the same kind, to Hooker & Co., and indorsed on each of them his personal guaranty of payment at maturity.   Hooker & Co. afterwards assigned this note to Pearce for the benefit of their creditors.

The only question presented by this record is, can Foote, in this state of affairs, because of the illegality of the consideration, rescind his action, retract his transfer and delivery of this note in such payment, and in an ordinary common law action of trover recover from Pearce the value of this note? I think he can not lawfully do so.   Undoubtedly, gambling transactions of this character are illegal, and incapable of enforcement in our courts.   (See *Lyon* v. *Culbertson*, 83 Ill. 33.)   By section 131 of the Criminal Code, all notes or securities are declared void which are made where any part of the consideration is any valuable thing won upon a wager on any unknown or contingent event, or made for reimbursing any money lent or advanced at the time and place of such bet, to any person so betting.   The bets in this case were made when the time contracts were made.   The money advanced by Hooker & Co. was not so advanced at the time of such bet, but at a subsequent time.   The case does not fall within the latter clause of this section.   The bets, however, were upon a contingent and unknown event, and had Foote made and given his note to the winner, promising to pay to him the money won by him, such note would have been void.   The bets in this case were in the name of Hooker & Co., on Foote's account, with the parties with whom they professed to make these time contracts.   Foote was the real party betting with such parties.   It was he, and not Hooker & Co., who was to win or lose upon the result.   As it turned out, the parties with whom Hooker & Co. contracted were the winners, and Foote was the loser.   Nominally, Hooker & Co. were losers, but in reality Foote was the loser on these bets.   Surely Hooker & Co. were not winners, *even nominally*, or in any sense.

Were this an action by Hooker & Co. to recover their demand for advances and commissions, or upon a note given to them by Foote for that consideration, it is plain they could not recover, because the action would be founded upon illegality. At common law, where a contract is founded upon an illegal consideration, it can not be enforced by either party by the aid of any court, in case the parties are *in pari delicto*. "*In pari delicto potior est conditio defendentis et possidentis.*" (*Smith* v. *Broadley*, 2 Doug. 696; *Binnington* v. *Wallis*, 4 Barn. & Ald. 650; *Cowan* v. *Milburn*, L. R. 2 Exch. 230.) Another maxim is, "*Ex turpi causa non oritur actio.*" But where contracts founded upon illegal consideration have been performed, the common law will not aid either party to place himself *in statu quo* by his rescinding the contract. In such case, the parties being *in pari delicto*, the law leaves them where it finds them, giving aid to neither. *Mosher* v. *Griffin*, 51 Ill. 184; *Nellis* v. *Clark*, 20 Wend. 24; *Goudy* v. *Gebhart*, 1 Ohio St. 266; *Knowlton* v. *Congress Springs Co.* 57 N. Y. 258; *Hoover* v. *Pearce*, 26 Miss. 627; *McWilliams* v. *Phillips*, 51 id. 196. Nor can any money or valuable thing which has been advanced in pursuance of such contract, be recovered back, at common law. *Hanson* v. *Hancock*, 8 T. R. 575; *McClosky* v. *Gordon*, 26 Miss. 260; *Bouton* v. *Bouton*, 4 Rich. (S. C.) 491; *Thomas* v. *Richland*, 12 Wall. 349; *Setter* v. *Alvey*, 15 Kan. 157; *Adams* v. *Barrett*, 5 Ga. 404; *Babcock* v. *Thomson*, 3 Pick. 446; *Gill* v. *Webb*, 4 T. B. Mon. 249; *Welch* v. *Cutler*, 44 N. H. 561; *Danforth* v. *Evans*, 14 Vt. 538; *McCullum* v. *Gourley*, 8 Johns. 147; *Hudsforth* v. *Wilson*, 2 Dev. (N. C. L.) 372. In fact, no exceptions are found to these rules where the principles of the common law control.

I can not appreciate, or recognize as sound, the suggestion that there is and can be no such thing as agency in the perpetration of crimes and misdemeanors, or in the doing of unlawful acts. The mere fact that by our Criminal Code he who has advised or directed another to commit an offence is

punished as though he had committed the same in person, does not, so far as I can conceive, militate against the idea that the real actor is, in that regard, the agent of the other.

Where statutes have invaded or intrenched upon the rules of the common law stated above, the modification of these rules has always, so far as I can learn, been closely confined by the courts to the cases designated in the statute. And so in Indiana, where a statute of that State declared void all bonds and other securities where any part of the consideration should be for money or property won upon *any wager*, and that if any person should lose and deliver to another any money or property upon a wager upon *any game*, the person so losing and delivering might recover the money or thing so lost and delivered, by action of debt, it was held, in a case where two yards of broadcloth was lost and delivered, upon a wager on the result of the presidential election, that the loser could not recover for the same against the winner, and this upon the ground that the wager in question was not upon *a game.* The court said, in substance, that if the goods had not been delivered the winner could not have recovered the same, because the wager was unlawful; but the goods having been delivered, although upon an unlawful wager, the same could not be recovered by action, unless it be so provided by statute, and that the case did not fall within the statute in that regard, because the wager was not upon any game. And the court cite, with approbation, the words of Lord ELDON, in *Hanson* v. *Hancock, supra,* that "there is no case to be found where money has been actually paid upon an illegal contract,—both parties being *particeps criminis,*—where an action has been maintained to recover it back again." Unless, therefore, in the case at bar the action can be sustained by some provision of the statute of Illinois, it can not be sustained at all.

The consideration for the sale of the notes by Foote to Hooker was undoubtedly illegal, being services rendered and

money paid out in an unlawful enterprise; and on the same consideration rested the guaranty indorsed by Foote upon each of these notes. Foote and Hooker & Co. were *in pari delicto,* so far as the gambling is involved. It was therefore held in *Tenney et al.* v. *Foote,* 95 Ill. 99, (and properly held,) that no action would lie upon the guaranty of payment by Foote indorsed upon one of these four notes so sold by him to Hooker & Co. in this very transaction, and by them assigned to Tenney and others. Counsel for appellee seems to regard that decision as sustaining a right of action in the case at bar. This is clearly a misapprehension. Where parties are equally guilty of the illegality which taints a contract,—as Hooker & Co. and Foote were in this case,—the law, unless the statute so enacts, will give no aid in enforcing a contract which has not been executed,—such as was the guaranty of Foote upon these notes. Nor will it, where the contract has been executed, as by payment made by the delivery of the notes in this case, give aid in putting the party *in statu quo,* by rescinding the sale and delivery of the notes. I do not understand that the decision in *Tenney et al.* v. *Foote* goes to the length of holding the fact of delivery of the note in payment to Hooker & Co., as was done, to be a void fact. It is not so stated in the opinion, and the only question in that case was upon the validity of the guaranty of Foote. That guaranty, founded upon an illegal consideration, we have seen could not be the basis of an action, and so it was there held.

It remains to inquire whether any statute of this State sustains this action. Reliance is placed upon section 132 of the Criminal Code as supporting this action. That section, rejecting verbiage which can by no possibility apply to this case, provides: "Any person who shall, * * · by any wager or bet upon any * * * contingent event, lose to any person so * * * betting, any sum of money or other valuable thing, (amounting in the whole to the sum of $10,) and shall pay or deliver the same, or any part thereof, the person so

losing and paying or delivering the same shall be at liberty
to sue for and recover the money or other valuable thing so
lost and paid or delivered, or any part thereof, or the full
value of the same, by action of  *  *  *  trover, or proceed-
ing in chancery, *from the winner thereof*, with costs, in any
court of competent jurisdiction.   In any such action at law
it shall be sufficient for the plaintiff to declare, generally,
as in actions of  *  *  *  trover, upon a supposed finding
and the detaining or converting the property of the plaintiff
to the use of the defendant, *whereby* an action hath accrued
to the plaintiff *according to the form of this act*, without setting
forth the special matter."   And in case of failure in the loser
to so prosecute within six months, "it shall be lawful for any
person to sue for and recover treble the value of the money
*  *  *  and other things, with costs of suit, by special action
on the case against such winner aforesaid, one-half to the use
of the county and the other to the person suing."

It is plain this action is not brought under that section of
the statute.   The declaration is a common declaration in
trover at common law.   It does not set forth any special
matter to bring the case within the statute, nor does it, in lieu
thereof, as permitted by the statute, use the words "whereby
an action hath accrued to the plaintiff according to the form
of" the statute in section 132 of the Criminal Code, nor does
the declaration use any words indicating that the action is
brought at all under the statute.   In such case the statute
can not be invoked in support of the action.   Again, had the
declaration stated that the action was brought under the
statute, the case made by the facts is not the case provided
for in this section of the statute.   That section invades the
common law, so as to permit *the loser* of property or money
on a wager, where it has been delivered or paid, by action at
law, to recover back the same *from the winner* to whom it has
been paid or delivered, and it gives no action against any one
except against *the winner* on the wager.   I *can not* perceive

how Hooker & Co. can in any rational sense be said to be *winners*. They made gaming contracts (for Foote) with other parties, and on these gaming contracts these other parties won. If Hooker & Co. are to be regarded as principals in these gaming contracts, then they were the *losers*, not winners. When, therefore, Foote paid to them their losses, by selling and delivering to them this note, he paid it to losers, and not to winners. This section of the statute does not say the title to property so paid out shall not pass by delivery. It simply gives a statutory action by the loser *against the winner*, and against no one else. Even if Hooker & Co. could be held to be *winners*, the statute does not give an action against an innocent assignee of the winner, who has received of the winner the money or thing won upon the wager. Pearce can not be said to be a winner. He took no part in the wager. He has done no unlawful act. There was no wager between Foote and Pearce, wherein Foote lost to Pearce any money or other valuable thing. Even had the statute given action against an assignee of the winner, still this case would not fall within the statute, for there was no wager between Foote and Hooker & Co., the assignors of Pearce, on which Foote lost to Hooker & Co. any money or valuable thing. The statutory liability imposed upon the winner was intended as a punishment upon *the guilty winner*. Pearce was not guilty of gambling, and was not a winner. He not only was not a winner, but was entirely innocent of the gambling, and knew not of any fact pertaining thereto until the trial of this cause. The controversy here is, in fact, between Foote on the one side, who was guilty of gambling, and the creditors of Hooker & Co. on the other, who are represented here by Pearce. I do not think there is in this case anything calling upon us to extend, by construction, a penal statute so as to aid and abet one of the guilty parties to prevail against the honest and innocent creditors of Foote's associates in violating the law.

I think the judgment against Pearce ought to be reversed.